UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SPORTS MANAGEMENT NETWORK,

        Plaintiff and Counter-
        Defendant,

v.

KURT BUSCH, AND KURT BUSCH INC.,

        Defendants,

v.

FRASCO, CAPONIGRO, WINEMAN, &
SCHEIBLE, PLLC, AND JOHN
CAPONIGRO

        Counter-Defendants.

_____/

Case No. 17-10413

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
ELIZABETH A. STAFFORD

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [121/123];
GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT [122]; DENYING COUNTER-PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT [151/153]; GRANTING IN PART AND DENYING IN PART COUNTER-
DEFENDANTS' MOTION TO DISMISS [95]; AND DENYING AS MOOT COUNTER-
DEFENDANTS' MOTION IN THE ALTERNATIVE FOR SUMMARY JUDGMENT [95]**

### INTRODUCTION

This is a diversity action brought by a sports representation agency, Sports

Management Network, against a former client, Kurt Busch, Inc. Michigan law

governs this diversity action. See *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); *Himmel v. Ford Motor Co.,* 342 F.3d 593, 598 (6th Cir. 2003). The two parties signed a Representation Agreement in 2005 and then extended that agreement in 2010. Plaintiff alleges that they modified that agreement in 2013 to replace a flat annual fee with a percentage-based contingency fee. After the Representation Agreement was terminated in 2016, Plaintiff continued to send invoices to the Defendants. Defendants refused to pay those invoices, however, and in 2016 they disavowed the alleged 2013 RA modification.

## PROCEDURAL BACKGROUND

Sports Management Network filed its complaint on February 8, 2017 [Dkt. # 1]. Kurt Busch and Kurt Busch Inc. filed their answer and counterclaims [12] on March 24, 2017. They added Sports Management Network's CEO, John Caponigro, and his law firm, Frasco, Caponigro, Wineman, & Scheible, PLLC (FCWS), as counter-defendants. The counterclaims allege that Caponigro, SMN, and FCWS failed to disclose conflicts of interest and improperly advantaged themselves and their other clients at Defendants' expense.

All of the dispositive motions in this case were filed on July 30, 2018. Counter-defendants FCWS and Caponigro filed a motion to dismiss and a motion for Summary Judgment against Busch's counter claim [95]. Busch filed a Motion

for Summary Judgment against SMN [121], and a Motion for Summary Judgment on Counts I and III of their Counterclaim [151]. SMN filed a motion for Summary Judgment for its own case and against Defendants' counterclaims [122]. These motions were filed under seal and are now fully briefed. The Court held a hearing on February 12, 2019.

<h3 style="text-align:center">FACTUAL BACKGROUND</h3>

Defendant and Counter-Plaintiff, Kurt Busch, began his stock car racing career in 2000, at the age of 21. He represented himself for several years before partnering with Sports Management Network (SMN), a Troy-based sports management agency. In 2005, Busch signed a contract to drive with Penske Racing, which was facilitated by John Caponigro, an attorney and the founder and CEO of SMN. On November 16, 2005, Kurt Busch and Kurt Busch, Inc. ("Busch") entered into a Representation Agreement (RA) with John Caponigro, "and [his] related firms, Sports Management Network, Inc. and Frasco, Caponigro, Wineman, & Scheible, PLLC." (Dkt. 126). The contract called for Caponigro's entities, which were collectively called "SMN," to provide representation, negotiation, and legal, personal, and financial services. (Id.). Busch would pay SMN an annual fee in addition to a percentage of income from agreements negotiated for him. (Id.).

On August 11, 2010, the parties extended the RA to December 31, 2014 and increased the annual flat fee by 25%. (Dkt. 128). The contract is written in the first-person plural on Sports Management letter-head and refers to "SMN" continuing the representation outlined in the 2005 RA. (Id.).

On November 28, 2011, following an embarrassing tirade caught on camera, Busch signed an Agreement and Release which ended his relationship with Penske Racing. (Dkt. 124-13). This caused Busch's income to drop precipitously.

Plaintiff alleges that around July 2012, Busch offered, and SMN accepted, to compensate SMN under a modified RA ("the 2013 Modified RA") commencing on January 1, 2013 at a rate of 10% of driver retainer negotiated and 10% of revenue paid to defendants from personal service agreements. (Dkt. 103-6). This modification, whose existence is in dispute, replaced the annual flat fee entirely with percentage-based contingency fees. (Id.). Though Busch may have negotiated this contract, he never signed it.

After 2011, Busch gradually rebuilt his racing career. He started driving for Phoenix Racing in 2012 and then Furniture Row Racing in 2013. (Kurt Busch Dep. 158-159, Apr. 19, 2018, Dkt. 104). He then began driving for Stewart-Haas Racing in 2014. (Id at 160-61). Also in 2014, Busch agreed to drive "the double" for Andretti Autosport. (Id. at 163-164). The double, which Busch referred to as "a bucket list

item" entails two races, the Indianapolis 500 in the afternoon and the Coca-Cola 600 in the evening, a combined 1100 miles of racing in one day. (Id. at 164-65). Busch was named "Rookie of the Year for the Indianapolis 500," in which he finished in sixth place. (Id. at 165-66). He was paid only half of his driver's fee in 2014, however, and the other half not until 2016.

Based on the 2013 modified RA, SMN generated invoices, which Busch paid, through 2013, 2014, 2015, and the first quarter of 2016, without dispute. (Dkt. 122-10). Busch argues that it simply paid these invoices because they appeared to be consistent with the usual amounts under the 2010 contract. In March 2016, Defendants terminated their relationship with SMN effective immediately, and ceased paying SMN altogether. SMN continued sending quarterly invoices for services it alleges were provided under the 2013 Modified RA.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). Movant bears the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-movant lacks evidence to support an

essential element of his case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Non-movant cannot rest on the pleadings and must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd*., 475 U.S. at 586-87. Non-movant must "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.,* 477 U.S. at 324 (quoting Rule 56(e)); see also *United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993).

## ANALYSIS

### I.     SMN's Complaint: Breach of Contract

Sports Management Network brings a breach of contract action alleging that Busch reneged on its contractual obligation to pay 10% of driver fees and sponsorship fees negotiated by SMN. It argues that the parties agreed that the 2013 RA Modification was to control the future relationship between SMN and Busch. That contract was never signed by Busch, and Busch denies that it ever agreed to its terms. However, Busch paid invoices sent in accordance with the contract terms for over three years, up until the first quarter of 2016.

Busch's main defense is that the contract represents an unethical legal representation agreement. Michigan courts have found that retainer agreements that

breach the State's Rules of Professional Ethics are unenforceable. *Evans & Luptak v. Lizza*, 251 Mich. App. 187 (Mich. Ct. App. 2002). *Evans & Luptak* looked to Michigan courts' refusal to enforce specific performance of contracts that are illegal or against public policy. *Id*. (citing *Weller v. Weller*, 344 Mich. 614 (Mich. 1956) and *Cook v. Wolverine Stockyards, Co.,* 344 Mich. 2017 (1955)). *Evans & Luptak* recognized that an attorney's conduct is against public policy if it violates Michigan's attorney discipline rules. *Id*. at 196.

Plaintiff is correct to observe that the Michigan Rules of Professional Conduct do not constitute substantive law, and their violation cannot create a cause of action. MICH. R. PROF'L CONDUCT 1.0 ("[A] violation of a rule does not give rise to a cause of action, nor does it create any presumption that a legal duty has been breached."). Nevertheless, the Sixth Circuit has held that the rules may be probative to establishing the standard of care that one party owes another. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 411 (6th Cir. 2008). In that case, the court ruled that a law firm could be liable for malpractice where it represented both the City of Windsor and the owner of the Ambassador Bridge (which connects Windsor to Detroit) in negotiating environmental terms between the bridge and the city. *Id*.

SMN objects to the argument that it provides legal services. John Caponigro denies that SMN practiced law. (John Caponigro Dep. 100, Apr. 30, 2018, Dkt. 106).

There is no doubt, however, that John Caponigro practiced law while acting as Busch's agent. Though Caponigro drafted and reviewed contracts in his SMN capacity, he also "exercised [his] legal knowledge for and on Kurt's behalf." (Id. at 29, 30 & 100). There is some confusion over whether FCWS was brought in to provide legal services for Busch by SMN or at Busch's request, with SMN only acting as the coordinator (Id. at 63-64), but given the close intermingling of the law firm and the non-law business, and Caponigro's insouciance over the distinction between the two, delineating between legal and non-legal services is impossible. As Caponigro reflected, noting the parties' discussions of attorney "hats" and agents "hats," "I wasn't worried about what hat I was wearing at the time." (Id. at 29). When asked if he represented Busch as an agent or lawyer in his separation from Penske, Caponigro answered, "I was – I was – I brought every element of my experience, background, and knowledge, legal and otherwise, to him in that instance." (Id. at 20).

Attorneys serving as sports agents typically have dual functions. Though non-attorneys can of course serve as sports agents, representing an athlete entails many duties that would be considered traditional legal work. See Walter T. Champion, Jr. *Attorneys Qua Sports Agents: An Ethical Conundrum*, 7 MARQ. SPORTS L.J. 349 (Spring 1997) ("These functions might include: contract negotiations, tax planning,

financial planning, money management, investments, estate planning, income tax preparation, incorporating the client, endorsements, sports medicine consultation, physical health consultation, post-career development, career and personal development counseling, legal consultations and insurance matters."). As Caponigro acknowledges, his legal skills have increased his marketability as a sports agent. (Caponigro Dep. at 16).

Caponigro cannot profit from his law license in good times, but then claim he was only acting as a sports agent when problems arise. Whether or not SMN was engaged in the practice of law is irrelevant; Caponigro held himself out as both an attorney and as an agent of SMN. (Id. at 27-32). The 2013 RA Modification, taken in context of the 2005 RA and the 2010 extension, erases distinction between John Caponigro the managing partner at FCWS and John Caponigro the President of SMN.

There is no doubt that Caponigro acted in violation of Michigan's Rules of Professional Ethics. Caponigro violated MICH. R. PROF'L CONDUCT 1.7(a) by representing a client whose interests are directly adverse to another client, and Rule 1.7(b) by representing a client in a manner that could be materially limited "by the lawyer's own interests." Caponigro is the CEO and majority stakeholder in SMN. (Id. at 11). His representation of Kurt Busch, and Kurt Busch, Inc. is thus inherently

limited by his fiduciary loyalty to SMN. This is precisely why the Michigan State

Bar's Ethics Opinions warn against contractually intermingling legal and non-legal

business.

> [L]egal services may not be made part of the contract with the nonlaw business MRPC.5, 7.2(c), MCL 450.681. The lawyer must remain free to exercise independent professional judgment regarding whether to represent the customer and what legal services the customer should have, without being influenced by whatever the nonlaw business has recommended to the customer.

Michigan Ethics Op. R1-190.

> The unsigned March 11, 2013 Letter of Agreement clearly violates this

policy. The preamble explains

> [The Agreement's] purpose is to confirm the understanding reached between us concerning the on-going representation by myself and my related firms, Sports Management Network, Inc., and Frasco Caponigro Wineman & Scheible, PLLC (hereinafter collectively referred to as "SMN"), of you and Kurt Busch, Inc., ("KBI") in your various professional, corporate, business and personal interests, as more fully described below.

(Dkt. 131 Ex. 7).

Even though the 2013 Agreement calls for legal assistance to be provided "at

Busch's written request," no such written requests seem to have been made, and the

negotiation and drafting of driver and personal services contracts is included without

reservation under SMN services.

The Michigan Rules of Professional Ethics provides that a conflict such as the one between Caponigro's loyalty to Busch and his loyalty to Sports Management Network requires informed consent from both clients. MICH. R. PROF'L CONDUCT 1.7. SMN has advanced no evidence that any informed consent was given, however, and relies instead on a theory of implied consent. *Centra* forecloses this defense, however.

The Sixth Circuit looked at Michigan's Rules of Professional Conduct, Rule 1.7(a), ABA Model Rules, Rule 1.7, and the Restatement 3d of the Laws Governing Lawyers § 122 and held that "providing the client with anything less than full information runs the risk that the client is inadequately informed, thereby making any consent invalid." *Centra*, 538 F.2d at 415. "The Restatement requires that attorneys inform their clients of the nature of the conflict so that the clients are 'aware of the material respects in which the representation could have adverse effects on the interests of that client.'" *Id*. (citing RESTATEMENT § 122 cmt. c(i)).

Caponigro never informed Busch of the nature of his conflicts because Caponigro never believed he had a conflict. He certainly never gave sufficient informed consent so that both parties "underst[ood] the reasons why it may be desirable for each to have independent counsel, with undivided loyalty to the

interests of each of them." *Id.* at 415-16 (citing *Unified Sewerage Agency v. Jelco, Inc.*, 646 F.2d 1339, 1345-46 (9th Cir. 1981)).

The conflict between SMN and Busch was exacerbated by SMN's representation of several of the driving teams that employed Busch. SMN provided sponsorship representation for Penske Racing, for whom Busch drove from 2005 to 2011. (Walter Czarnecki Dep. 13-16, Feb. 1, 2018, Dkt. 124-6; Roger Penske Dep. 17, Feb. 2, 2018, Dkt. 124-15). SMN also represented Busch in several negotiations adverse to Penske, including a buyout from Busch's previous racing team, the terms of his 2010 extension, and the terms of his 2011 separation, which included a waiver of all of his rights under his driver agreement. (Czarnecki Dep. 192-193). Caponigro considered Penske and Busch not to be clients but to be "benefactors to this effort that I was putting forth." (Caponigro Dep. 97). He saw himself as one "facilitating a meeting of the minds." (Id. at 119). Indeed, Penske Racing paid Caponigro, in the capacity of FCWS, a substantial sum for his "coordination" between Busch and Penske in 2005. (Penske Dep. 88-89). This underscores the unfairness at the heart of Caponigro's conflict of interest. He billed himself as Busch's agent and attorney, but when Busch's interests were adverse to his other clients, the best he could provide was facilitation, not the loyalty that is the lodestone of Rule 1.7. The conflict ran even deeper with Andretti Autosport, with whom SMN negotiated several contracts

on Busch's behalf. Andretti Autosport was a client of both FCWS and SMN, and Michael Andretti has been a client of John Caponigro and FCWS since 1990. (Andretti Dep. 9, Feb. 2, 2018, Dkt. 117). Regardless of whether Busch can prove injury from these conflicts, they are sufficiently egregious to infect the entire RA.

The 2013 Agreement contemplated the provision of legal services in a manner violative of legal professional ethics. It is therefore unenforceable. *Evans & Luptak,* 251 Mich.App. at 192.

## II.  SMN's Complaint: Other Counts

The remainder of SMN's causes of action cannot survive summary judgment.

Count 2: Statutory Conversion

SMN argues that Busch converted the amount he owed to SMN, by virtue of not paying his bills. Refusing to pay a debt, however, is not cause for conversion. "The defendant must have obtained the money without the owner's consent to the creation of a debtor and creditor relationship." *Citizens Ins Co v Delcamp Truck Center, Inc,* 178 Mich. App. 570, 575 (Mich. Ct. App. 1989); *see also Head v. Phillips Camper Sales & Rental, Inc.*, 234 Mich. App. 94, 111-12 (Mich. Ct. App. 1999) ("To support an action for conversion of money, the defendant must have an obligation to return the specific money entrusted to his care."). Conversion cannot be alleged in a breach of contract case where the Plaintiff does not have ownership

rights the sum of money in dispute. *AKB Wireless v. Wireless Toyz Franchise, LLC* 2015 WL 8769964 at *6 (E.D. Mich. Dec. 15, 2015).

Count 3: Fraudulent Misrepresentation

SMN argues that it relied upon Busch's misrepresentations that he would pay the outstanding amount. A critical element of this tort is that the tortfeasor knew that the misrepresentation that induced reliance was false when he made it. *Hi-Way Motor Co. v. International Harvester Co*., 398 Mich. 330 (1976). There is no evidence that if Busch acceded to the 2013 Agreement he did so with specific intent to defraud SMN. Indeed, SMN's own theory of the case is that Busch decided to renege on the contract in 2016, following a dispute of Caponigro's negotiations with Stewart-Haas Racing (See Dkt. 137).

Counts 5 & 7: Unjust Enrichment and Quantum Meruit

Michigan provides several equitable causes of action against those who "[have] been unjustly enriched at the expense of another." *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 193 (Mich. Ct. App. 2006). There are two problems with these causes of action. First, an implied contract will not be found were there is an express contract between the two parties. *Id*. at 194 (citing *Belle Isle Grill Corp. v. Detroit*, 256 Mich. App. 463, 478 (Mich. Ct. App. 2003)). The Court

will not imply a contract that was already found to be unenforceable because it exposed SMN to too many unethical conflicts.

Second, equitable remedies are not available to parties seeking to enforce agreements that violate Michigan's Rules of Professional Ethics. *See, e.g., Weller v. Weller*, 344 Mich. 614 (Mich. 1956); *see also In Re Karabatian's Estate*, 17 Mich.App. 541, 546-47 (Mich. Ct. App. 1969) ("If an attorney's conduct so violates the spirit of the lawyer's code of ethics, it also runs contrary to the public policy of this state."). It is axiomatic that a party seeking relief in equity must come before the court with clean hands. *Stachnik v. Winkel*, 394 Mich. 375, 386 (Mich. 1975). As made clear in *Evans & Luptak*, where a party provides legal services tainted by undisclosed conflicts, it cannot sue equity to receive fees for those services. 251 Mich. App. at 195.

There is no imaginable way to dissect the permissible from the impermissible elements of the 2013 contract. Even non-attorney SMN employees reported to John Caponigro, and even non-legal elements of SMN's representation, such as public relations, ran parallel to legal elements, such as contract negotiations. Again, there is no way that the Court could "imply" a contract that does not suffer from the same infirmities as the express contract.

Count 5: Fiduciary Duty

SMN has it backwards. A sports agent owes its client a duty of fiduciary duty.

*See Detroit Lions, Inc. v. Argovitz*, 767 F.2d 919 (6th Cir. 1985).

Count 6: Promissory Estoppel

The elements of the equitable remedy of promissory estoppel are as follows.

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*Chart Twp. Of Ypsilanti v. Gen Motors Corp.,* 201 Mich. App. 128, 133 (1993) citing Restatement Contracts, 2d, § 90.

"Promissory estoppel is not a doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event that it fails to prove a breach of contract." *General Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1042 (6th Cir. 1990). Plaintiff has no claims for promissory estoppel because to enforce the alleged promise would be to enforce an unethical legal representation agreement. This would invite, not avoid, injustice.

Count 9: Account stated / Open account

An account stated claim is "An account stated means a balance struck between the parties on a settlement; and where a plaintiff is able to show that the mutual dealings which have occurred between two parties have been adjusted, settled, and a balance struck, the law implies a promise to pay that balance." *Watkins v. Ford*, 69

Mich. 357, 361, 37 N.W. 300, 302, (Mich. 1888). The problem with this cause of action is that at is premised on the existence of an "express or implied contract." *Fisher Sand & Gravel Co. v. Neal A Newbie, Inc*. 494 Mich. 543 (Mich. 2013). Since neither an express or implied contract could avoid the conflicts of interest between Busch, SMN, and the various racing teams represented by SMN, no such contract can sustain this cause of action.

Taken in the light most favorable to its case, Sports Management Network is unable to make out a cause of action against Kurt Busch or Kurt Busch, Inc.

III.    **Busch's Counterclaims: Statute of Limitations**

Busch argues that John Caponigro, SMN, and FCWS failed comply with Michigan rules of professional conduct for attorneys. Busch alleges that as a result of these conflicts of interest, he suffered millions of dollars of opportunity costs. He alleges breaches of contract, breaches of fiduciary duty, and legal malpractice against SMN, FCWS, and John Caponigro.

A. Choice of Law

Michigan law governs this diversity action. See *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); *Himmel v. Ford Motor Co.,* 342 F.3d 593, 598 (6th Cir. 2003). Though Michigan's statute of limitations would normally apply as a matter of course, FCWS and SMN argue that North Carolina's statute of limitations

and statute of repose should be used, pursuant to Michigan's borrowing statute, M.C.L. § 600.5861. "A borrowing statute is a legislative exception from the general rule that the forum always applies its statute of limitation." *Combs v. Int'l Ins. Co*., 354 F.3d 568, 578 (6th Cir. 2004). Michigan's borrowing statute provides, "An action based upon a cause of action accruing without this state shall not be commenced after the expiration of the statute of limitations of either this state or the place without this state where the cause of action accrued[.]" M.C.L. § 600.581.

The Sixth Circuit has cautioned courts to "proceed with caution in interpreting a state's borrowing statute." *CMACO Auto Sys, v. Wanxiang Am. Corp*., 589 F.3d 235 (6th Cir. 2009). The *Combs* Court warned against endorsing policy innovations when interpreting borrowing statutes and recommended handling the issue "charily." *Combs*, 354 F.3d at 578.

Courts determining whether to apply borrowing statutes must consider if the Michigan connections in a case are "merely tangential" or "essential facts giving rise to the cause of action." *CMACO*, 589 F.3d at 247 (quoting *Scherer v. Hellstrom*, 716 N.W.2d 307, 310 (Mich. Ct. App. 2006)). The court in *CMACO* confronted the question of whether the borrowing statute applied where a California plaintiff sued a Chinese Defendant and its Kentucky subsidiary over a commercial manufacturing contract involving a Michigan buyer. *CMACO*, 589 F.3d at 237-40. It asked where

the cause of action accrued, and decided that California's statute of limitations should be applied, because the injury was felt in the corporate plaintiff's headquarters in California. *Id*. at 245-46. This case is much simpler than *CMACO*, however.

Defendants are Michigan entities staffed by Michigan licensed attorneys. In *Scherer*, a Michigan Court of Appeals found that a defendant who breached a Florida real estate contract with a Georgia plaintiff could not avail herself of Michigan's borrowing statute because the defendant wrongfully sold the house while residing in Michigan. *Scherer*, 716 N.W.2d 310-11. Accrual is based not only on where the injury is felt but also on where the defendant was residing when he reneged on his contractual duties. *Id*. The counterclaims all entail counter-defendants' failure to perform a duty while in Michigan, where their offices were located and where they conducted their business.

Counter-Plaintiffs allege continuous conflicts of interest that infected Counter-Defendants' representation of Busch not only when they travelled to North Carolina to meet with him personally, but during the whole course of their representation. John Caponigro met with Roger Penske, Busch's former boss, at Penske Racing's headquarters in Michigan, as was typical, to negotiate the release. (Claude Denker Dep. 55-56, Mar. 2, 2018, Dkt. 124-9). The Agreement and Release

was drafted in Michigan and reviewed by FCWS attorneys in Michigan, and it was informed by phone conversations between Penske representatives based in Michigan. Michigan's borrowing statute is therefore not applicable. Events or omissions transpiring in Michigan are essential, not tangential to the causes of action arising from Busch's driving career with Penske.

B. The Accrual of Counter-Plaintiffs' Claims

Michigan has a two-year statute of limitations for legal malpractice, a three-year statute of limitations for breach of fiduciary duty, and a six-year statute of limitations for breach of contract. M.C.L. 600.5805. MCL § 600.5827 governs the calculation of these statutes of limitations.

> Except as otherwise expressly provided, the period of limitations runs from the time the claim accrues. The claim accrues at the time provided in sections 5829 to 5838, and in cases not covered by these sections the claim accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results.

MCL § 600.5827.

Counter-Plaintiff relies on the proposition that, "A claim of breach of fiduciary duty or breach of trust accrues when the beneficiary knew or should have known of the breach." *Bay Mills Indian Community v. Michigan,* 244 Mich.App. 739, 751, 626 N.W.2d 169 (2001). *Bay Mills* is no longer good law, however. The Michigan Supreme Court did away with the common law discovery rule in

*Trentadue v. Gordon*, 738 N.W.2d 664, 669-670 (Mich. 2007) (holding that the statutory scheme of the Revised Judicature Act is "exclusive and thus precludes the common law practice of tolling accrual based on discovery in case where none of the statutory tolling provisions apply."). This holding has been upheld by courts in this district. *See Roy v. Michigan Child Care Centers, Inc*. 2009 WL 648496 at *8 (E.D. Mich. Mar. 11, 2009).

If Counter-Plaintiffs are to toll their claims, it must be through the statutory tolling mechanisms. Two statutory tolling provisions are at issue: M.C.L. § 600.5855 (fraudulent concealment) and M.C.L. § 600.5838 (claim based on malpractice). Neither one will save the counterclaims arising from Busch's relationship with Penske.

M.C.L. § 600.5855 provides as follows.

If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations.

M.C.L. § 600.5855.

Courts have held that the burden to prove fraudulent concealment is on the plaintiff (here, counter-plaintiff). *Brownell v. Garber*, 199 Mich. App 519, 527

(1993). Though generally fraudulent concealment requires "an affirmative act or misrepresentation," an exception is made where a fiduciary relationship exists. *Id* (citing *Lumber Village, Inc. v. Siegler*, 355 N.W.2d 654 (1984)). Counter-Plaintiffs rely on *Pukke v. Hyman Lippitt, P.C.,* No. 265477, 2006 WL 1540781, at *11–12 (Mich. Ct. App. June 6, 2006), an unpublished case that traces the exception to the "affirmative act or misrepresentation" rule to the theory of "silent fraud" as articulated in *M&D, Inc. v. W.B. McConkey*, 585 N.W.2d 33 (Mich. Ct. App. 1998).

> A fraud arising from the suppression of the truth is as prejudicial as that which springs from the assertion of a falsehood, and courts have not hesitated to sustain recoveries where the truth has been suppressed with the intent to defraud. Thus, the suppression of a material fact, which a party in good faith is duty-bound to disclose, is equivalent to a false representation and will support an action in fraud.

231 Mich. App. at 28–29 (quoting *Lorenzo v. Noel*, 206 Mich. App. 682, 684-85 (Mich. Ct. App. 1994)).

Indeed, fraudulent concealment is concerned with the intentional suppression of facts. A fiduciary's failure to provide informed consent to a conflict is a suppression of legal advice. It may constitute malpractice, but it cannot constitute fraud. Though the *Pukke* court condemned a tortfeasor-attorney's failure to provide informed consent to his client that he was heavily conflicted, his main fraudulent concealment consisted of embezzling money from various companies, lying to

investors, and actively concealing wrongdoing. *Pukke*, 2006 WL 1540781. This case is nothing like *Pukke*. It is undisputed that, however uninformed he was about the legality of his agents' representation of his racing teams, Busch knew that the Counter-Defendants represented several of the racing teams for which he drove.

That Busch wasn't told that Counter-Defendants' conflicts violated the Michigan Rules of Professional Ethics, or could materially affect their representation of him, may constitute legal malpractice, but it does not constitute fraud. Further, fraudulent concealment requires intent. Counter-Plaintiffs' repeated assertions that Caponigro still doesn't realize that his representation was conflicted serve to undermine any fraudulent concealment allegations. Further, Busch's allegations of fraud are only made in defense to the statute of limitations, however, not in the complaint. The failure to plead fraud is itself sufficient to bar a M.C.L. 600.5855 defense. *See Doe v. Roman Catholic Archdiocese of Detroit*, 692 N.W.2d 398 (Mich. Ct. App. 2004) ("plaintiff must plead in the complaint the acts or misrepresentations that comprised the fraudulent concealment."); see also FED. R. CIV. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). M.C.L. 600.5855 will therefore not toll Counter-Plaintiffs' expired claims.

M.C.L. § 600.5838 will, however, provide Counter-Plaintiff with limited

tolling. M.C.L. § 600.5838 provides as follows.

> (1) Except as otherwise provided in section 5838a or 5838b, a claim based on the malpractice of a person who is, or holds himself or herself out to be, a member of a state licensed profession accrues at the time that person discontinues serving the plaintiff in a professional or pseudoprofessional capacity as to the matters out of which the claim for malpractice arose, regardless of the time the plaintiff discovers or otherwise has knowledge of the claim.

M.C.L. § 600.5838(1).

Much turns on how the phrase, "matters out of which the claim for malpractice arose." In interpreting statutes, courts "must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory." *Johnson v. Recca*, 492 Mich. 169, 177 (Mich. 2012). If the statute called for the claims to be accrued when the state licensed professional ceased entirely to represent the aggrieved client, the language "as to the matters out of which the claim for malpractice arose" would be surplusage. Instead, the "matters" clearly refers to those specific duties that the state licensed professional undertook on behalf of her client.

In the context of this case, Busch's relationship to, and subsequent separation from, Penske Racing would certainly be its own matter. The statute of limitations began to run after the Agreement and Release was signed, in November of 2011, and

was long-expired by the time of this suit. Relationships with Andretti Autosport, Stewart-Haas Racing, and other entities are distinct matters which, if they did not terminate prior to March 24, 2015, could toll the statute of limitations as to legal malpractice claims, which, unlike breach of fiduciary duty claims, have two-year, not three-year statutes of limitation.

Counter-Plaintiffs' breach of fiduciary duty claims are not subject to the same rules, however even though its breach of contract claims may be. Counter-Defendants' reliance on *Aldred v. O'Hara-Bruce*, 184 Mich. App. 488 (Mich. Ct. App. 1990) is misplaced. *Aldred* held that "claims against attorneys brought on the basis of inadequate representation sound in tort and are governed by the malpractice statute of limitations, even though a plaintiff may assert that the attorney's actions breached a contract." *Id* at 672-673.

Counter-Plaintiff is alleging far more than inadequate representation, however. Legal malpractice may be simply "professional negligence." *Radtke v. Miller, Canfield, Paddock & Stone*, 453 Mich. 413, 424 (Mich. 1996). Breach of fiduciary duty, by contrast, requires a more culpable state of mind, and entails the abuse of a position of influence. *Prentis Family Foundation, Inc v. Barbara Ann Karmanos Cancer Inst,* 266 Mich. App. 39, 47 (Mich. Ct. App. 2005). It is a tort

distinct from legal malpractice, and therefore is subject to a three-year statute of limitations. *Id*.; M.C.L. 600.5805(10).

Counter-Plaintiff's breach of contract claims, however, are governed by either of the two statutes of limitations above, depending on the level of culpability required. For purposes of determining which statute of limitations applies, the Court must look to the gravamen of the action. *Teneco Inc. v. Amerisure Mut. Ins. Co.*, 281 Mich. App. 429, 457 (Mich. Ct. App. 2008). "[T]he gravamen of an action is determined by reading the complaint as a whole, and by looking beyond mere procedural labels to determine the exact nature of the claim." *Id*. (quoting *Adams v Adams (On Reconsideration)*, 276 Mich. App. 704, 710; 742 NW2d 399 (Mich. Ct. App. 2007). Though the complaint focuses extensively on Counter-Defendants' breaches of their fiduciary duty and legal malpractice, it only references the contracts between the parties in order to characterize them as legal services agreements. The bare-bones breach of contract allegations merely proves the existence of contractual duties, but not what those duties were or how they were breached. The statute of limitations for breach of contract is therefore not applicable.

IV.    **Busch's Counterclaims against SMN and FCWS**

Counter-Plaintiff can allege breach of fiduciary duty for claims that occurred after March 24, 2014. It will not have summary judgment on those claims, however,

because it fails to prove damages. Busch argues that *Evans & Luptak* supports the proposition that automatic and total disgorgement of legal fees is warranted where an attorney breaches her ethical duties. It does not. The clean hands doctrine at the heart of *Evans & Luptak's* holding requires courts to refrain from using their equitable powers to enforce unethical agreements. *Evans & Luptak*, 251 Mich. App. at 194-95. It does not provide a rationale for courts to order a refund of payments that have already been made. Busch's case sounds in tort, not equity, and he must therefore prove damages.

As discussed above, attorney ethics can provide guidance on where conflicts between SMN, FCWS, and Busch arose, and what standard of care they owed Busch. *See CenTra, Inc.*, 538 F.3d at 410. But whether they are the proximate cause of injuries incurred by Busch, and the extent of those injuries, are both elements that must be proven. Legal malpractice requires proof that "negligence was a proximate cause of an injury" and "the fact and extent of the injury alleged." *Simko v. Blake*, 448 Mich. 648, 655 (Mich. 1995). Similarly, the Court is aware of no Michigan case law provides for automatic disgorgement of fees as a remedy for breach of fiduciary duty. Michigan law clearly calls for a jury determination with respect to liability for damages in a breach of fiduciary duty case. *Prentis Family Found.*, 266 Mich. App. at 53.

Busch alleges that he was injured by Counter-Defendants' conflicts of interest with Penske Racing and Andretti Autosport. Breach of fiduciary duty and legal malpractice claims arising from the former are time-barred, as Counter-Defendants' representation of Busch as to Penske Racing ended in 2011. (Busch Dep. 157). Claims arising from the latter are not time-barred, however.

Even taken in the light most favorable to Busch, his cause of action arising from his career with Andretti Autosport is foreclosed by the facts of this case. Busch's argument that he could have gotten more money for racing "the double" is purely speculative, especially as Michael Andretti testified that he was shocked when John Caponigro asked for such a high payment for a single race. (Andretti Dep. 31). Busch testified that he expected Caponigro to negotiate harder with Andretti (Id at. 167), but he provides no evidence to refute Andretti's recollection that Caponigro drove a hard deal. Busch also conceded that Caponigro's relationship with the Andretti family helped him get hired by Andretti in the first place. (Busch Dep. 164).

It would also be near impossible for Busch to argue at trial that Caponigro delayed securing the second half of Busch's payment because he was insufficiently aggressive. Not only did Andretti testify that Caponigro was constantly asking for Busch to get paid (albeit without threatening suit), but he testified that it was Kurt

Busch who told him, in Las Vegas in November of 2014, that there was no urgency. (Andretti Dep. 85-86). This is corroborated by Busch's text message to Caponigro on November 5, 2014, which read, "Btw bumped into Michael Andretti. We talked. All is good. I might have him set up a rally care practice to prepare for my off-season races. That could chop some of the bill." (Dkt. 124-22). Just because Caponigro's relationship with an adverse party precludes him or his entities from enforcing agreements tainted from those conflicts does not automatically mean that the conflicts themselves led to damages. Busch has nothing to resist summary judgment except the bare suspicion that Caponigro could have done better. This is not enough. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

Busch has also provided no evidence that Caponigro's, SMN's, or FCWS's representation breached the applicable duty of care as to the sundry negotiations over Busch's share of sponsorship income. Busch may believe that he was entitled a cut of the sponsorship money provided by Monster to Stewart-Haas racing (Busch Dep. 176), but he has not demonstrated how Counter-Defendants breached their fiduciary duty, breached their contract, or committed legal malpractice by, in his view, not negotiating hard enough. Counter-Plaintiffs' expert report puts numbers on what

Busch's sponsorship deals could have been worth, but it does not explain how Counter-Defendants' breach proximately caused any of those opportunities to be lost. (Expert Report of Daniel A. Rascher, Aug. 28, 2018, Dkt. 183-1).

## CONCLUSION

The alleged 2013 RA Modification is violative of Michigan's Rules of Professional Ethics. It required John Caponigro to split his loyalty between his client and his company, between his client and his company's clients, and between his client and his law firm's clients. The Court need not rule on whether all these conflicts were even waivable, because no one ever asked Busch for informed consent. Knowledges that one's attorney represents adverse parties is no substitute for a candid explanation of why such conflicts may impair the quality of the attorney's representation, and why retaining outside counsel is advisable. Though an agent's connection to racing teams may be exactly what attracts drivers to seek his or her representation, when the agent is also providing legal services he or she must be sure that the driver understands what he or she is giving up by becoming a client of his boss's attorney.

Because SMN and FCWS failed to provide his client with a meaningful choice on whether such conflicts were permissible, they will not be able to enforce their 2013 RA Modification. This does not mean that their representation actually caused

injury, however. Having reviewed the record, the Court finds that Busch has not advanced sufficient evidence of damages to bring the case to a jury.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment [121/123] is **GRANTED**.

**IT IS FURTHER ORDERED** that Counter-Plaintiffs' Motion for Summary Judgment [151/153] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment [122] is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Counter-Defendants' Motion to Dismiss [95] is **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that Counter-Defendants' Motion in the Alternative for Summary Judgment [95] is **DENIED AS MOOT**.

**SO ORDERED**.

<u>s/Arthur J. Tarnow</u>
Arthur J. Tarnow
Senior United States District Judge

Dated: March 6, 2019